UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>ORTHOFIX, INC. )<br>)<br>Defendant. )<br>) | CRIMINAL NO. 12-CR-10169-WGY |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States hereby submits its sentencing memorandum in connection with Orthofix, Inc.'s ("Orthofix") plea to the felony of obstruction of a federal audit in violation of 18 U.S.C. §1516. As set forth in more detail below, the United States submits that the Court should impose the recommended sentence, including a criminal fine of $7,765,737 and a civil payment of $34,234,263, plus interest.

Orthofix has agreed in the plea agreement (filed with this Court; see Docket No. 2) to plead guilty to a felony, namely obstruction of a federal audit in violation of 18 U.S.C. §1516. That crime was part of a constellation of illegal, fraudulent conduct undertaken at virtually every stage of the promotion, sale and billing of Orthofix's bone growth stimulators, and the fines and payments contemplated by the plea agreement, which Orthofix represented to the government were at the top end of its available cash, are both deserved and necessary to accomplish the goals of federal sentencing.

I.  **Background**

   A.   Orthofix And Its Bone Growth Stimulators

Orthofix, a Minnesota corporation, headquartered in Texas, was a subsidiary of Orthofix

International, N.V., a publicly-traded NASDAQ-listed company (symbol: OFIX) operating under the laws of Curacao. See Information (Docket No. 1) at ¶1.

Orthofix manufactured and sold medical devices known as bone growth stimulators. These devices were worn externally near the site of spinal fusions or non-union fractures and stimulate healing through emission of pulsed electromagnetic fields. These medical devices belonged to a category of devices called durable medical equipment. Orthofix made and sold three types of bone growth stimulators: (1) the Spinal-Stim; (2) the Cervical-Stim; and (3) the Physio-Stim. Each of these devices was FDA-approved for certain uses.

Orthofix manufactured these devices in Texas and promoted and sold them nationwide through sales representatives and distributors spread around the country to hospitals, doctors and other health care providers. The list price for these stimulators was approximately $5,000. Typically, insurers paid Orthofix between $3,000 and $4,000 for the stimulators.

B. The Sales

Orthofix is one of at least four major players in the bone growth stimulator business. It is a competitive marketplace for these devices. At all relevant times, Orthofix employed dozens of sales representatives who managed territories throughout the United States. The territory managers were responsible for selling bone growth stimulators to customers in that defined territory. Each Orthofix territory manager had a quarterly and annual sales quota, and compensation and job retention at Orthofix were largely based on meeting quota. Orthofix management reviewed the sales performance against the sales quotas of the individual sales representatives on at least a monthly basis. Many of Orthofix's sales representatives worked on a straight commission basis, and the highest producing Orthofix sales representatives earned more

than $500,000 per year.

The primary manner in which Orthofix, through its sales representatives, promoted its bone growth stimulators was through meetings with doctors and their staff. Once a doctor agreed to use the Orthofix bone growth stimulator, Medicare and many private insurers had various requirements before paying for the stimulator. These included certain medical requirements, physician order requirements, and in the case of Medicare, the completion by the doctor of a Certificate of Medical Necessity ("CMN"). The Orthofix sales representatives were responsible for collecting this paperwork from the medical offices and sending it to Orthofix's home office in Texas. At its home office, Orthofix then prepared bills to send to the relevant insurers (and the beneficiaries for co-payments). In addition, payments from insurers and beneficiaries were tracked and received at Orthofix's home office.

C. The Billing and Payment

As noted, while the marketing and promotion of the bone growth stimulators took place in thousands of medical offices spread across the country, the billing and collecting all took place at Orthofix's home office in Texas. For the relevant time period, Medicare was one of the largest, if not the largest, source of insurance payments for Orthofix, accounting for between 20 and 25% of Orthofix's revenue. Medicare was and is a federal program to pay for the cost of certain medical services and care for persons aged 65 and older, and for persons with disabilities. Medicare covered certain costs of durable medical equipment, including bone growth stimulators, for accredited DME suppliers. Orthofix was an accredited DME supplier, and during the relevant time frame, submitted claims to Medicare for millions of dollars worth of bone growth stimulators.

Medicare paid for 80% of allowable costs for bone growth stimulators. The remaining 20% is known as the co-payment, and is the responsibility of the beneficiary (though Medicare beneficiaries can obtain secondary insurance that covers that cost). For example, if Medicare's allowable rate for a bone growth stimulator was $4,000, Medicare paid 80% of that amount ($3,200) and a beneficiary with no secondary insurance was responsible for the remaining 20% ($800).[1]

A unique feature of Medicare, as distinguished from certain private insurance plans, was the requirement of the written Certificate of Medical Necessity, also known as the CMN. The CMN was a form that assisted Medicare in determining that the bone growth stimulator was medically necessary for the patient prior to payment. Orthofix was required to maintain the original CMN for audit and inspection by CMS. An example of a blank CMN is attached hereto as Exhibit ("Ex.") 1.

At the heart of the CMN was a requirement that the physician describe why the device was medically necessary for the patient. The importance of the CMN is illustrated by a fraud alert issued in early 1999 by the Office of Inspector General of HHS:

> The Medicare program only pays for health care services that are medically necessary. In determining what services are medically necessary, Medicare primarily relies on the professional judgment of the beneficiary's treating physician, since he or she knows the patient's history and makes critical decisions, such as admitting the patient to the hospital; ordering tests, drugs, and treatments; and determining the length of treatment. In other words, the physician has a key role in determining both the medical need for, and utilization of, many health care services, including those furnished and billed by other providers and suppliers. Congress has conditioned payment for many Medicare items and services on a certification signed by a physician attesting that the item or service is medically

---

[1] Beneficiaries who met certain poverty guidelines could receive a waiver of their co-pay obligations from Orthofix.

> necessary. For example, physicians are routinely required to certify to the medical
> necessity for any service for which they submit bills to the Medicare program . . . .
> These documentation requirements substantiate that the physician has reviewed
> the patient's condition and has determined that services or supplies are medically
> necessary.

HHS-OIG Special Fraud Alert: Physician Liability for Certifications in the Provision of Medical Equipment and Supplies and Home Health Services, 64 FR 1813 (January 12, 1999).

In the CMN, the physician was required to indicate the patient's "estimated length of need" or the number of months that the patient was expected to be treated with the device. The physician also was required to provide a diagnosis code and answer several questions about the patient's injury. For instance, the physician was asked, "Is the device being ordered following multi-level spinal fusion surgery?" and "In a fracture, has there been no clinically significant radiographic evidence of healing for a minimum of 90 days?" At the beginning of Section B the following admonition appeared: **"Information in this Section May Not Be Completed by the Supplier of the Items/Supplies."** (emphasis in original) (see Ex. 1). The CMN also contained a section (Section D) that required the physician to sign and date the form, certifying, among other things, that the "medical necessity information in Section B is true, accurate and complete, to the best of my knowledge. . ."

As set forth below, Orthofix engaged in various fraudulent conduct with respect to the CMNs, including obstructing a federal audit in 2008.

II.   **Orthofix's Crime and Its Other Fraudulent Conduct**.

    A.   The Felony Crime of Conviction

Orthofix stands before the court having agreed to plead guilty to a felony, namely obstructing a federal audit, in 2008 in violation of 18 U.S.C. §1516. Orthofix has admitted that it

5

committed that crime and did so with an "intent to deceive and defraud the United States." As set forth in the plea agreement and Criminal Information, the basis for Orthofix's felonious conduct was the manipulation of the CMNs and deception of federal auditors about the manipulated CMNs. Orthofix manipulated CMNs in various ways, including:

- Orthofix territory managers filled out the entire CMN themselves, including the estimated length of need section (Information at ¶16);

- Orthofix territory managers had physicians sign pads of blank CMNs, and the territory managers filled in the rest of the details later (id.); and

- Orthofix territory managers forged physician signatures on CMNs (id. at ¶17).

Many Orthofix territory managers would maintain copies of surgeons' signatures in their home offices or cars and paste these signatures on CMNs and other documents. Examples of manipulated CMNs and cut-out physicians' signatures are attached as Exhibit 2.

In addition to these manipulations, Orthofix coached physicians' staff members to write "9 months" as the estimated length of need on the CMN for every patient without regard to the physician's medical judgment about an individual patient's estimated length of treatment. Orthofix management was aware of this conduct, and in some instances trained the sales force to do so. In reality, the estimated length of need varied by patient, depending on the patient's unique circumstances. Some physicians instructed their patients to use the device for 6 weeks to 3 months. (Information at ¶19).

In June 2008, Medicare, through one of its contractors, conducted an audit of Orthofix at its Texas home office. The purpose of the audit was to ensure that Orthofix was in compliance with its Medicare DME supplier standards. During this audit, the inspector reviewed a number of Orthofix CMNs. In the audit report, the inspector commented that: "[a] review of the supplier/

manufacturer's Medicare beneficiary patient files showed extensive documentation of each patient's medical history, the required signed CMN and the attending physician's treatment summary documenting the fact that all of the Medicare medical necessity requirements had been met prior to prescribing the spinal osteogenesis stimulator." (Id. at ¶22).

However, during the audit, Orthofix knew but failed to disclose that: (1) numerous territory managers filled out the entire medical necessity section with no input from the treating physician; (2) some territory managers had coached physicians or their staff to fill out the length of need at "9 months" for all Medicare patients; and (3) some territory managers had forged physicians' signatures in CMNs. The information that Orthofix failed to disclose to the inspector was material to CMS in determining whether Orthofix was entitled to keep Medicare payments for bone growth stimulators that had been previously received. (Id. at ¶24).

In evaluating Orthofix's conduct for the purpose of sentencing, it is important to understand that the criminal conduct was neither isolated nor merely taking place at the territory manager level. Numerous Orthofix territory managers informed the government that they were trained by managers to manipulate the CMNs by filling out the length of need sections, getting blank signed CMNs or by outright forging doctors' signatures on them. Moreover, these practices were known to Orthofix management and compliance personnel at its home office for years prior to the beginning of the government's investigation. For example, an Orthofix Medicare specialist and other insurance administrators frequently reported that territory managers were improperly forging and manipulating CMNs, but little was done to address this misconduct prior to this investigation. A small sample of these reports is attached as Exhibit 3.

Finally, there is a multitude of evidence that Orthofix also coached physicians' staff

members to write "9 months" as the estimated length of need on the CMN for every patient without regard to the physician's medical judgment about an individual patient's estimated length of treatment. That evidence includes Orthofix's own internal training documents and official policies. In official training materials, Orthofix instructed its sales force that the CMNs always had to be filled out the same way–including the estimated length of need section. (See Ex. 4). Moreover, Orthofix promulgated an official company policy requiring that physicians complete each CMN in the same fashion. If a doctor included any information in a CMN that deviated from this official Orthofix policy, the CMN was returned to the applicable territory manager to have the form "corrected" before it was submitted to Medicare. (See Ex. 5).

When the government began investigating Orthofix's CMN manipulation practices, Orthofix attempted to cover up this conduct. In February 2010, Orthofix's former Vice President of Sales, Tom Guerrieri, instructed his sales managers to advise the Territory Managers precisely how they should respond to government inquiries about the CMN issue. In substance, Guerrieri told the Regional Sales Directors to instruct the Territory Managers that if they were asked by the government why "9 months" consistently appeared in the estimated length of need field of the Orthofix CMNs, they should say, in essence, that surgeons completed these forms independently and without influence from Orthofix. In fact, as Guerrieri and other Orthofix senior executives knew, this was false; for years Orthofix had trained the sales force how to fill out CMNs, including that "9 months" must appear in the estimated length of need field.

    B.    Orthofix's Other Fraudulent Conduct

As set forth in the civil settlement agreement and in charges against an array of Orthofix employees who have pled guilty to various felonies, the scope of Orthofix's misconduct is much

broader than the count of felony conviction. As these sources demonstrate, Orthofix's misconduct infected every phase of its efforts to promote and sell its bone growth stimulators and included:

(1) lying to beneficiaries (and their doctors) about the co-payment obligations;

(2) failing to advise beneficiaries that they had the option to rent the devices on a monthly basis rather than purchase them outright at a higher cost;

(3) forging CMNs;

(4) forging prescriptions;

(5) forging and/or manipulating patient medical records; and

(6) paying doctors or their staff kickbacks (sometimes in cash) to induce orders of Orthofix devices.[2]

While the civil settlement agreement includes some of these issues as part of the covered conduct in respect of which Orthofix is paying in excess of $34 million, the details of the scope of Orthofix's misconduct emerge through the prosecutions of a number of its former employees. As to two issues – kickbacks and falsifying medical records – the individual prosecutions reveal the depth and breadth of Orthofix's misconduct.

With respect to the kickbacks, Orthofix's former Vice President of Sales, Thomas Guerrieri, pled guilty to paying kickbacks. See United States v. Guerrieri, 12-CR-10061-RWZ. In particular, Guerrieri admitted to and pled guilty to paying kickbacks to a surgeon in New York and to Michael Cobb, a Physician's Assistant in Rhode Island. Cobb also has pled guilty to accepting kickbacks from Orthofix in connection with his receipt of monies from Orthofix in

---

[2]Some of the above described conduct came to light in connection with the company's cooperation with the government in furtherance of its cooperation obligations in the plea agreement.

exchange for directing bone stimulator business of surgeons that he worked with toward Orthofix. See United States v. Cobb, 12-CR-10053-GAO.

With respect to falsifying medical records to induce insurers, such as Medicare, to pay for bone growth stimulators, the prosecutions of two former Orthofix territory managers provide a detailed picture of this conduct. See United States v. Derrick Field, 12-CR-10057-JLT; United States v. Michael McKay, 12-CR-10129-DJC. The pleas in these two cases illustrate that, with respect to the Physio-Stim long bone growth stimulators, a number of Orthofix sales representatives falsified patient medical records in order to satisfy Medicare's rule that it would only pay for the device if the patient had not healed 90 days after an injury. The routine falsification of medical records by members of the sales force has resulted in a number of prosecutions already, and that investigation is ongoing. There was nothing nuanced or sophisticated about this fraud; Orthofix employees falsified medical records to make it appear that patients had not healed for 90 days in order to induce Medicare to pay for bone growth stimulators. One of these defendants, Derrick Field, was also captured by the government on tape telling a Medicare beneficiary that he could throw in the "trash" any co-pay bill he received from Medicare. This advice was emblematic of broader conduct by Orthofix with respect to collection of co-payments, conduct which formed a portion of the civil settlement.

III.     The Sentence Comports with the Sentencing Guidelines and the §3553 Factors.

As noted and calculated in the plea agreement, the proposed criminal fine is consistent with the guideline regime for sentencing of organizations set forth in Chapter 8 of the United States Sentencing Guidelines. In general, corporations and other organizations do not in and of themselves commit the acts that constitute the criminal conduct; corporate crimes are committed

by a series of acts committed by individual employees and agents of the corporation. See e.g., United States v. C.R. Bard, Inc., 848 F.Supp. 287, 289 (D. Mass. 1994)("A corporation is a legal fiction. Individuals act for a corporation. Individuals commit crimes on behalf of a corporation.").

With Orthofix that point is well illustrated. As noted above, a number of Orthofix employees and executives have already pled guilty to a variety of felonies. Orthofix as an organization was responsible for training and condoning this criminal conduct, promoting individuals, including some of these individual defendants, who had engaged in conduct that was known to senior executives at Orthofix to be wrongful and/or criminal. As this case demonstrates, Orthofix as an organization completely failed to "maintain internal mechanisms for preventing, detecting and reporting criminal conduct." U.S.S.G. Chapter 8, Sentencing of Organizations, Introductory Commentary. Now that Orthofix has replaced its senior management team and entered into a Corporate Integrity Agreement with the Department of Health and Human Services, it is the government's hope and expectation that these failings will not be repeated.

However, given the well-documented failings that form the basis for the felony crime of conviction, Orthofix's sentence must "provide just punishment, adequate deterrence, and incentives . . . to maintain internal mechanisms for preventing, detecting and reporting criminal conduct." Id. A combined criminal and civil payment of in excess of $42 million, an amount that according to Orthofix strained the limits of its available cash, reflects appropriately on the seriousness of the felony obstruction charge of which Orthofix stands convicted. The crime is serious, obstructing Medicare in its quest to audit and in turn only pay for proper claims. The

history and characteristics of Orthofix, in the context of this investigation, reflected a renegade organization dedicated to making sales without regard to compliance with clear and applicable laws. While the new management has laudably largely cleaned house, that housecleaning took place only under the pressure of multiple findings of misconduct relayed to Orthofix by the government after a lengthy grand jury investigation. Orthofix only began to address its wrongdoing under the crucible of a mature grand jury investigation, as opposed to redressing the issues that were known to it at the outset of the government investigation.

This sentence is both commensurate with the Sentencing Guidelines and the presence of the companion Corporate Integrity Agreement provides a high level of confidence that the public will be protected from further Orthofix crimes. See 18 U.S.C. §3553(a)(2)(C). The government believes that the companion criminal fine and civil settlement amounts of over $42 million with interest, at the upper limit of Orthofix's available cash at the time the agreement was struck, when coupled with the provisions and oversight contained in the Corporate Integrity Agreement, are sufficiently onerous and punitive to reflect the seriousness of Orthofix's felonious criminal conduct and to promote respect for the law. See 18 U.S.C. §3553(a)(2)(A). Moreover, the proposed sentence, and the Corporate Integrity Agreement, ought to ensure specific deterrence as to Orthofix and its employees, and one hopes that this prosecution, this punishment and the prosecutions of the Orthofix individuals will have a companion general deterrent impact on the industry. See 18 U.S.C. §3553(a)(2)(B).

In sum, the government requests that the Court accept the plea and impose the following sentence: a criminal fine of $7,765,737 (which under the terms of the Civil Settlement Agreement will trigger Orthofix's obligation to pay a civil settlement amount of $34,234,263,

plus interest) and a mandatory special assessment of $400.

                                          Respectfully submitted,

                                          CARMEN M. ORTIZ
                                          United States Attorney

                                    By:  /s/ David Schumacher
                                          David S. Schumacher
                                          Jeremy M. Sternberg
                                          Assistant U.S. Attorneys
                                          (617) 748-3100