UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____ )
                               )
UNITED STATES OF AMERICA,      )
                               )
                               )
          v.                   )  CRIMINAL ACTION
                               )  NO. 12-10169-WGY
ORTHOFIX, INC.,                )
                               )
               Defendant.      )
_____ )



_____ )
                               )
                               )
UNITED STATES OF AMERICA,      )
                               )
                               )
          v.                   )  CRIMINAL ACTION
                               )  NO. 12-10374-WGY
APTx VEHICLE SYSTEMS LIMITED,  )
                               )
               Defendant.      )
_____ )
```

MEMORANDUM

YOUNG, D.J.                                    July 26, 2013

## I. INTRODUCTION

    For seventeen years, this Court unconstitutionally
sentenced offenders in accordance with an oxymoron -- mandatory
guidelines.  Even after the Supreme Court finally put paid to
this practice, United States v. Booker, 543 U.S. 220 (2005), and

recalled district judges to their duty to exercise wise discretion in sentencing offenders, I continued, rather reflexively,[1] to accept "take it or leave it" pleas from corporate criminals in accordance with Federal Rule of Criminal Procedure 11(c)(1)(C) (known commonly as "(C) pleas").  See, e.g., United States v. TAP Pharm. Prods., Inc., No. 01-10354-WGY, ECF No. 6 (tendering under Rule 11(c)(1)(C) a plea of guilty to the crime of conspiracy to violate 21 U.S.C. sections 331(t) and 333(b) by causing the sale of drug samples, all in violation of 18 U.S.C. section 371); Elec. Clerk's Notes, Oct. 16, 2011, No. 01-10354-WGY (accepting the aforementioned plea without inquiry).  After all, I reasoned -- shallowly, as it now turns out -- such pleas are closely akin to contracts, the government law enforcers obviously are satisfied, and what more is required?

---

[1] By way of explanation but not excuse, it ought be noted that (1) for seventeen years, judges were taught that they had little role in sentencing, and what discretion was left was largely arithmetic, see Kate Stith & José A. Cabranes, Fear of Judging (1998), and (2) the institutional judiciary has embraced an administrative model of the judicial role in which case resolution appears to be the major goal, see, e.g., United States v. Massachusetts, 781 F. Supp. 2d 1, 21-26 (D. Mass. 2011); Patrick E. Higginbotham, The Present Plight of the United States District Courts, 60 Duke L.J. 745 (2010); Arthur R. Miller, Simplified Pleading, Meaningful Days in Court, and Trials on the Merits: Reflections on the Deformation of Federal Procedure, 88 N.Y.U. L. Rev. 286 (2013).

Then, at 2 PM on Monday, July 23, 2012, Orthofix, Inc. ("Orthofix") appeared before the Court prepared to plead to a one-count information charging it with obstruction of a federal audit in violation of 18 U.S.C. section 1516, see Hr'g Tr. ("July 23, 2012, Hr'g Tr."), July 23, 2012, No. 12-10169-WGY, ECF No. 10,[2] and expecting immediately to be sentenced[3] pursuant to a (C) plea deal in which Orthofix would pay $7,765,737 in criminal fines and $400 for a mandatory special assessment and the United States would agree to seek neither a separate restitution order nor a term of probation (due to Orthofix's entering into a Corporate Integrity Agreement with the Office of Inspector General of the Department of Health and Human Services),[4] Plea Agreement Orthofix, Inc. ("Orthofix's Original Plea") ¶ 5(a)-(d), No. 12-10169-WGY, ECF No. 2.  Here, for the first time, this Court expressed its concerns regarding its acceptance of a (C)

---

[2] This memorandum cites to materials found on two separate dockets.  For the purpose of clarity, the Court includes within its citations to said materials the docket number associated with them.

[3] The parties agreed to forgo a presentence report.  See Def.'s Mot. Waive Presentence Report & Conduct Combined Change Plea & Sentencing Hr'g, No. 12-10169-WGY, ECF No. 8.  Evidently, Orthofix's PR folks had in mind a one-day story.

[4] Appended to Orthofix's (C) plea was a sentencing recommendation that the United States Attorney for the District of Massachusetts and the Department of Justice had agreed upon in consultation with Orthofix.  See Plea Agreement Orthofix, Inc. ¶ 5, No. 12-10169-WGY, ECF No. 2.

plea.  See July 23, 2012, Hr'g Tr. 10:13-11:2.  This caught all

parties flat footed.  Quickly regrouping, counsel talked the

Court into holding a further hearing on September 6, 2012.  See

id. at 4:22-5:7.  The Court reiterated its concerns at this

hearing.  See Hr'g Tr. 3:1-14, Sept. 6, 2012, No. 12-10169-WGY,

ECF No. 19.  True to its word, this Court rejected Orthofix's

tender of a (C) plea on September 13, 2012, see Status

Conference Tr. 3:15-17, Sept. 13, 2012, No. 12-10169-WGY, ECF No.

24, and again on December 13, 2012, after carefully considering

the entire record (now including a thorough presentence report)

and entertaining extensive argument by counsel, see Hr'g Tr.

36:8-20, Dec. 13, 2012, No. 12-10169-WGY, ECF No. 36.

    The following day, the Court accepted a guilty plea from

Orthofix tendered under Federal Rule of Criminal Procedure

11(c)(1)(B) (a "(B) plea").[5]  See Elec. Clerk's Notes, Dec. 14,

---

[5] Rejection of a (C) plea from a corporate criminal
inevitably creates a tension between the parties' desire to
avoid a trial and the salutary requirement that, despite the
triumph of plea bargaining, see George Fisher, Plea Bargaining's
Triumph (2003), the Court shall not itself engage in such
bargaining, Fed. R. Crim. P. 11(c)(1) ("The Court must not
participate in these [plea] discussions.").  But see United
States v. Davila, 133 S. Ct. 2139, 2143 (2013) (holding that a
violation of Federal Rule of Criminal Procedure 11(c)(1) does
not require vacatur of a plea "if the record shows no prejudice
to [the defendant's] decision to plead guilty").  A close
reading of the transcript of the hearing here reveals that
Orthofix's counsel were, in essence, asking "If you won't go for
this, judge, what will you go for?" Orthofix did not tender a

4

2012, No. 12-10169-WGY, ECF. No. 38 (noting the Court's acceptance of the parties' revised plea agreement tendered under Rule 11(c)(1)(B)); see also Revised Plea Agreement ("Orthofix's Revised Plea"), No. 12-10169-WGY, ECF No. 41.

Four months later, in a different case, APTx Vehicle Systems Limited ("APTx") sought to tender a (C) plea to an information charging it with wire fraud, Information 1, No. 12-10374-WGY, ECF No. 1.  Elec. Clerk's Notes, Apr. 11, 2013, No. 12-10374-WGY, ECF No. 11.  APTx, a British company with a Norwegian principal, contracted with the government to construct fifty specialized vehicles[6] to be turned over to the Iraqi police in connection with the government's reconstruction efforts in Iraq.  APTx subcontracted the work to a Russian factory.  The contract price of $5.7 million was to be paid, as is common in international transactions, through a letter of credit, upon

---

(B) plea until it had a pretty good idea that the sanctions to be imposed would not increase drastically over that for which it had bargained.  Indeed, the whole thing felt more like the fairness hearing required before approving a class action settlement, see Fed. R. Civ. P. 23(e)(2), than a typical criminal proceeding.

[6] Think of a jeep, hardened or armored in an attempt to deal with improvised explosive devices, a hallmark of the Iraqi conflict.  See generally Daniel R. Beaver, Procurement: Military Vehicles and Durable Goods Industry, in The Oxford Companion to American Military History 568 (John Whiteclay Chambers II et al. eds., 1999).

receipt of a proper bill of lading and shipping documents
confirming that the vehicles were pierside, ready for shipment
to Iraq.  The documents were presented and the letter of credit
paid.  There were, however, no vehicles at pierside or anywhere
else, the documents presented were fraudulent, and the American
taxpayers were snookered out of $5.7 million.[7]  In the period
following APTx's submission of the allegedly fraudulent shipping
documents, APTx was acquired by a Russian company, ETP
Specialist Vehicle Systems, Ltd. ("ETP").  See Gov't's Mem.
Supp. Acceptance Plea ("Gov't's Mem. Supp. APTx") 3, No. 12-
10374-WGY, ECF No. 8.  Appended to APTx's (C) plea was a
sentencing recommendation for a $1 million fine and a $2 million
civil settlement to which the United States had agreed in
consultation with APTx.[8]  See Plea Agreement APTx Vehicle Systems

---

[7] Even allowing for the exigencies of war, this is a rather
remarkable lapse in contract administration.  Cf. Letter from
John F. Sopko, Special Inspector Gen. for Afg. Reconstruction,
to Defense Department officials (July 8, 2013), available at
http://www.sigar.mil/pdf/alerts/SIGAR%20SP-13-7.pdf (reporting
the United States's abandonment of a newly constructed, $34
million military command headquarters in Afghanistan); cf. also
Rajiv Chandrasekaran, A Brand-New U.S. Military Headquarters in
Afghanistan.  And Nobody to Use It, Wash. Post, http://www.
washingtonpost.com/world/national-security/a-brand-new-us-
military-headquarters-in-afghanistan-and-nobody-to-use-
it/2013/07/09/2bb73728-e8cd-11e2-a301-ea5a8116d211_print.html
(last updated July 10, 2013, 12:01 AM) (same).

[8] APTx's dubious activities, and the plea generated
therefrom, have been the subject of much attention.  See, e.g.,

Limited ("APTx's Plea") ¶ 5(a), ECF No. 3; APTx's Plea, Ex. A,
Settlement Agreement ("APTx's Civil Settlement Agreement") ¶ 1,
ECF No. 3-1.

At the APTx plea hearing, it appeared through Lomakina
Marianna Olegovna, Esq. ("Ms. Marianna"), a Russian attorney who
possessed what (in English translation) appeared to be a power
of attorney authorizing her to tender the agreed-upon (C) plea
on behalf of APTx.  Ms. Marianna had utterly no knowledge of any
of the affairs of APTx, did not personally know the sole
director who signed her power of attorney nor could she
recognize his signature, and of course she knew nothing of the
underlying fraud.  Pleasant and responsive throughout, she
appeared somewhat bemused by our plea procedures.  See Plea Hr'g
("APTx's Plea Hr'g") 3:23-18:2, Apr. 11, 2013, No. 12-10374-WGY,
ECF No. 15.

Just as this Court had rejected Orthofix's (C) plea, so
too this Court, on April 11, 2013, saw fit to reject APTx's (C)
plea, together with its recommended sentence.  Id. at 23:17-
24:17, 25:14-26:11.  APTx was allowed to withdraw its guilty
plea, and the case presently stands for trial.

---

Special Inspector Gen. for Iraq, Quarterly Report to the United
States Congress 22-23 (2013), available at http://www.sigir.mil/
files/quarterlyreports/April2013/Report_-_April_2013.pdf.

The Court's decisions in these two cases mark a decided contrast to its previous -- rather supine -- behavior, and a due regard for the hardworking, professional bar that must plan for and accommodate this Court's jurisprudence requires the Court to make some explanation.  Here it is.

This memorandum sets out the Court's reasons for rejecting each of the (C) pleas from these two corporate criminal defendants.  In many ways, the Court's decision to reject Orthofix's (C) plea stands as the better subject for elucidation of the Court's principled objection toward accepting (C) pleas from corporate criminals.  This is because, in contrast with the wholly unsatisfactory settlement proffered by APTx, see APTx's Plea Hr'g 18:13 ("[T]his is a strikingly below guidelines sentence . . . ."), Orthofix's plea was tendered as part of what was, substantially, "a fair and appropriate settlement," Tr. Arraignment, Plea & Sentencing ("Orthofix's Sentencing") 25:8, Dec. 14, 2012, No. 12-10169-WGY, ECF No. 39.  This memorandum articulates the Court's view of the unusually complex considerations posed by the sentencing of corporate criminals and lays out the Court's interpretation of the duties it must discharge, with prudence and circumspection, in performing its sentencing function.  The Court concludes that, in light of these considerations, it would be rare indeed for a corporate

8

criminal to persuade this Court that its guilty plea is an appropriate candidate for acceptance under the fetters of Rule 11(c)(1)(C).

## II.  ANALYSIS

### A. Sentencing and the Public Interest

Sentencing offenders is one of the two core responsibilities assumed by a federal district judge.[9]  See, e.g., Fed. R. Crim. P. 32(b)(1) ("The court must impose sentence without unnecessary delay."); United States v. Cruz, 120 F.3d 1, 3 n.4 (1st Cir. 1997) (en banc) ("The sentencing judge has the ultimate responsibility for the sentence and may decide to pursue matters in the teeth of an agreement by both sides to go in a different direction.") (citing United States v. Vaknin, 112 F.3d 579, 585 (1st Cir. 1997), abrogated by Booker, 543 U.S. 220).  Indeed, judges have historically enjoyed wide discretion in determining the appropriate sentence to apply to particular individuals.  See United States v. Mueffelman, 327 F. Supp. 2d

---

[9] The other is trying cases, either with a jury or jury-waived.  See Patrick E. Higginbotham, Essay, So Why Do We Call Them Trials Courts?, 55 SMU L. Rev. 1405 (2002); Hon. William G. Young, Vanishing Trials, Vanishing Juries, Vanishing Constitution, 40 Suffolk U. L. Rev. 67 (2006) (quoting the Honorable John Henry Meagher: "This is a trial court.  Trial judges ought go out on the bench every day and try cases," id. at 92 (quoting Hon. John Henry Meagher, Senior Justice, Mass. Superior Court (1978)) (internal quotation marks omitted)).

79, 82-83 (D. Mass. 2004) (Gertner, J.) (noting that judges once "enjoyed wide discretion to sentence within the broad punishment ranges, based on a host of issues, including rehabilitation, almost like a doctor or social worker exercising clinical judgment," id. at 83); Susan R. Klein, The Return of Federal Judicial Discretion in Criminal Sentencing, 39 Val. U. L. Rev. 693, 697 (2005) (noting that the early nineteenth-century regime "granted judges enormous and essentially unbridled authority to impose a sentence anywhere within the legislatively prescribed range, as sentences could not be appealed").  Such discretion, however, is no historical artifact; even today, sentencing remains squarely within the federal district judge's institutional competence.[10]

---

[10] For an excellent account of three characteristic trends in American sentencing, which chart an observable shift away from the traditional view of sentencing as falling within the judge's exclusive competence, see Judge Nancy Gertner, From Omnipotence to Impotence: American Judges and Sentencing, 4 Ohio St. J. Crim. L. 523 (2007).  Judge Gertner notes that, historically and prior to the introduction of the first sentencing guidelines, "American judges, like judges in other common law countries, believed that sentencing was an area of their special competence."  Id. at 524.  Although that belief began to diminish after the passage of the Sentencing Reform Act of 1984, Pub. L. No. 98-473, 98 Stat. 1987 (codified as amended at 18 U.S.C. §§ 3551-3742; 28 U.S.C. §§ 991-998), which paved the way for guidelines which many judges across the country interpreted as mandatory, Gertner, supra, at 524 (citing Stith & Cabranes, supra note 1, at 95), the Supreme Court evinced a more nuanced appreciation of the judge's focal role in sentencing in Booker.  In that case, the Supreme Court held that mandatory

Notwithstanding Congress's attempts to curb the judiciary's discretion in the Sentencing Reform Act of 1984 ("SRA"), Pub. L. No. 98-473, 98 Stat. 1987 (codified as amended at 18 U.S.C. §§ 3551-3742; 28 U.S.C. §§ 991-998), by establishing the United States Sentencing Commission (the "Sentencing Commission") to promulgate Federal Sentencing Guidelines (the "Guidelines"), the Supreme Court has held that these Guidelines are advisory rather than mandatory,[11] see Booker, 543 U.S. 220.  In addition and correlative to federal district judges' initial discretion in sentencing, they are also afforded a wide degree of latitude on appeal when it comes to reviewing the way in which they have exercised their discretion.  See Gall v. United States, 552 U.S. 38, 51 (2007) (noting, at least with respect to the Guidelines, that, "[r]egardless of whether the sentence imposed is inside or outside the Guidelines range, the appellate court must review the sentence under an abuse-of-discretion standard").

In exercising its discretion in sentencing defendants, the Court is bound to take account of the public interest.  See,

_____

guidelines stood in violation of the Sixth Amendment, and that sentencing guidelines were in fact, as their name suggests, at most, advisory.

[11] Judges who chafed under mandatory guidelines must remember that it was the unconstitutional abridgement of the constitutional rights of juries that rendered those mandatory guidelines improper, see Booker, 543 U.S. at 249-50, not the curbs on judicial discretion.

e.g., United States v. Milo, 506 F.3d 71, 78 (1st Cir. 2007)
("[T]he public interest often suggests discounting the
defendant's sentence no more than is necessary to elicit the
needed help." (emphasis added)); United States v. Castonguay,
843 F.2d 51, 52 (1st Cir. 1988) ("[18 U.S.C.] section 4205(b)(1)
. . . give[s] a sentencing judge authority, if the judge thinks
that the ends of justice and the public interest so require, to
set a higher minimum threshold period of imprisonment . . . ."
(emphasis added)).  The Court's concern for the public interest
is no less pressing when the Court is called upon to accept a
sentencing recommendation attached to a plea which is the
product of a plea bargain than it is when the Court determines
the appropriate sentence itself.  See, e.g., Am. Bar Ass'n, ABA
Standards for Criminal Justice: Pleas of Guilty (3d ed. 1999),
§ 14-1.1(b), at 1, available at http://www.americanbar.org/
content/dam/aba/publications/criminal_justice_standards/pleas_gu
ilty.authcheckdam.pdf ("As part of the plea process, appropriate
consideration should be given to the views of the parties, the
interests of the victims and the interest of the public in the
effective administration of justice." (emphasis added));[12] see

---

[12] Although the American Bar Association's standards are
merely hortatory, Strickland v. Washington, 466 U.S. 668, 688
(1984), the Supreme Court, writing in a different context,
concerning ineffective assistance of counsel of criminal

also Fed. R. Crim. P. 11(c)(3)(A) ("To the extent the plea

agreement is of the type specified in Rule 11(c)(1)(A) or (C),

the court may accept the agreement, reject it, or defer a

decision until the court has reviewed the presentence report.");

Santobello v. New York, 404 U.S. 257, 262 (1971) ("There is, of

course, no absolute right to have a guilty plea accepted.").

Given the mass of empirical literature pointing to the

pervasiveness of plea bargains in criminal cases,[13] it is

---

defendants, has held that "[p]revailing norms of practice as
reflected in American Bar Association standards and the
like . . . are guides to determining what is reasonable."  Id.
(citation omitted); accord United States v. Browne, 318 F.3d
261, 267 (1st Cir. 2003) ("[A]lthough clear standards have been
urged, notably in ABA Standards for Criminal Justice 6-53 (2d
ed. 1980), they do not have the force of law.").

[13] This phenomenon has been well documented both in the case
law and in the data collated by the Sentencing Commission.  See
Bordenkircher v. Hayes, 434 U.S. 357, 361-62 (1978) ("[W]hatever
might be the situation in an ideal world, the fact is that the
guilty plea and the often concomitant plea bargain are important
components of this country's criminal justice system."  Id. at
361 (alteration in original) (quoting Blackledge v. Allison, 431
U.S. 63, 71 (1977)) (internal quotation mark omitted)); United
States v. Kandirakis, 441 F. Supp. 2d 282, 284 (D. Mass. 2006)
("[S]o sweeping is our plea bargaining culture today, that it is
a staple of criminal practice in this circuit and district.");
U.S. Sentencing Comm'n, 2012 Sourcebook of Federal Sentencing
Statistics fig.C (2012) [hereinafter 2012 Sentencing
Statistics], available at http://www.ussc.gov/Research_and_
Statistics/Annual_Reports_and_Sourcebooks/2012/FigureC.pdf
(showing that ninety-seven percent of criminal cases in 2012
resulted in guilty pleas); U.S. Sentencing Comm'n, Overview of
Federal Criminal Cases: Fiscal Year 2011, at 3 (2012), available
at http://www.ussc.gov/Research/Research_Publications/2012/FY11_
Overview_Federal_Criminal_Cases.pdf ("In fiscal year 2011, more

particularly important that litigants understand the nature of the judge's role in exercising discretion whether or not to accept plea bargains.  Just as the Court must take account of the public interest when it exercises its discretion to fashion its own sentence, so too the Court must take account of the public interest when called upon to review a sentencing recommendation attached to a plea bargain.  In this respect, the judge's role remains unchanged.

### B.  Interpreting Plea Bargains

#### 1. The Figure of Plea Bargain as Contract Does Not Commend Itself to this Court

Although plea bargaining has long been embedded within the criminal justice system in the United States, see Joshua D. Asher, Note, Unbinding the Bound: Reframing the Availability of Sentence Modifications for Offenders Who Entered into 11(c)(1)(C) Plea Agreements, 111 Colum. L. Rev. 1004, 1015 (2011) (noting that "[p]lea bargaining has a long history in the United States"), it was not placed on a firm constitutional footing until 1970, see Brady v. United States, 397 U.S. 742 (1970).  In Brady v. United States, 397 U.S. 742, the Supreme Court upheld the constitutionality of plea bargaining, noting that it "cannot hold that it is unconstitutional for the State

_____

than 96 percent of all offenders [pleaded guilty], a rate that has been largely the same for ten years.").

to extend a benefit to a defendant who in turn extends a
substantial benefit to the State and who demonstrates by his
plea that he is ready and willing to admit his crime". Id. at
753 (emphases added).  Galvanized by the idea of the mutual
conferral of benefits between parties (and the possible waiver
of threatened sanctions), commentators in the field have drawn
extended analogies between plea bargaining and the procuring of
private agreements secured by contract.[14]  See, e.g., Thomas W.
Church, Jr., In Defense of "Bargain Justice," 13 Law & Soc'y
Rev. 509 (1979); Frank H. Easterbrook, Criminal Procedure as a
Market System, 12 J. Legal Stud. 289 (1983); Frank H.
Easterbrook, Plea Bargaining as Compromise, 101 Yale L.J. 1969
(1992).  It has not been unknown, however, for some of these
analogizers, carried away with the apparently endless
similarities between plea bargains and contracts, to gloss over
several important distinctions.

---

[14] For a cogent deconstruction of the contract analogy, and
an argument for accepting a modified version of the classical
paradigm, see Robert E. Scott & William J. Stuntz, Plea
Bargaining as Contract, 101 Yale L.J. 1909 (1992), which notes
that the rival claims of academics, who largely reject the
analogy of plea bargain as contract, and practitioners, who are
largely sympathetic to it, can be reconciled by acknowledging
that "plea bargains are both paradigmatic bargains of the sort
we routinely enforce in other contexts and the product of a
seriously flawed bargaining structure," id. at 1910.

Joshua Asher characterizes the putative similarity between plea-bargain and contract principles as follows: "[I]n exchange for the defendant's guilty plea, and thus waiver of his constitutional trial rights, the prosecutor would offer to make some concession, such as dropping charges or recommending a lighter sentence to the court."  Asher, supra, at 1017.

But this superficially pleasing symmetry, where mutual consideration appears to flow in dyadic form between the defendant and prosecutor, fails to take account of the elephant in the room -- the judge whose role it is zealously to protect the public interest.  Parties negotiating private contracts might negotiate in light of "the shadow of the law,"[15] but the shadow cast by a judge is inestimably darker, and the judicial role in scrutinizing the supposed contract is considerably more

---

[15] For the origin of this oft-quoted phrase, see Robert H. Mnookin & Lewis Kornhausert, Bargaining in the Shadow of the Law: The Case of Divorce, 88 Yale L.J. 950 (1979), which notes that, in the case of parties negotiating a divorce settlement, "[d]ivorcing parents do not bargain over the division of family wealth and custodial prerogatives in a vacuum; they bargain in the shadow of the law," id. at 968.  It is important to note, however, that the context within which Robert Mnookin and Lewis Kornhausert write -— namely, that of divorce -- involves far greater judicial scrutiny than is typical in the context of regular commercial agreements between private parties.  This, however, serves only to reinforce the point that judges exhibit greater laxity toward scrutinizing the agreements of private autonomous individuals in the civil context than they do in the criminal context when reviewing recommendations as to sentencing.

intensive, than is typical in judicial scrutiny of private agreements between autonomous private parties.[16]  See, e.g., Williams v. Walker-Thomas Furniture Co., 350 F.2d 445, 449-50 (D.C. Cir. 1965) (noting that, "[o]rdinarily, one who signs an agreement without full knowledge of its terms might be held to assume the risk that he has entered a one-sided bargain," id. at 449, and that the court therefore has no role to play; it is only in unusual cases, such as those of unconscionability, however, when "the usual rule that the terms of the agreement are not to be questioned should be abandoned and the court should consider whether the terms of the contract are so unfair that enforcement should be withheld," id. at 449-50 (emphasis added) (footnotes omitted)).

---

[16] To speak of the latitude afforded contracting parties is not, of course, to suggest that their capacity to enter into certain kinds of agreements may not be limited by the courts or the legislature under any conditions.  See West Coast Hotel Co. v. Parrish, 300 U.S. 379, 392-93 (1937) ("This power under the Constitution to restrict freedom of contract has had many illustrations.  That it may be exercised in the public interest with respect to contracts between employer and employee is undeniable." (footnote omitted) (citing Bunting v. Oregon, 243 U.S. 426 (1917); New York Cent. R.R. Co. v. White, 243 U.S. 188 (1917); Mountain Timber Co. v. Washington, 243 U.S. 219 (1917); Chicago, Burlington, & Quincy R.R. Co. v. McGuire, 219 U.S. 549 (1911); McLean v. Arkansas, 211 U.S. 539 (1909); Patterson v. Bark Eudora, 190 U.S. 169 (1903); Knoxville Iron Co. v. Harbison, 183 U.S. 13 (1901); Holden v. Hardy, 169 U.S. 366 (1898)).

The First Circuit, in United States v. Rivera-Martínez, 607 F.3d 283 (1st Cir. 2010), vacated, 131 S. Ct. 3088 (2011) (mem.), judgment reinstated, 665 F.3d 344 (1st Cir. 2011), cert. denied, 133 S. Ct. 212 (2012) (mem.), adopted a contract-based analysis in relation to the narrower question concerning the propriety of subsequently modifying a sentence that has already been imposed pursuant to a (C) plea, where the Guidelines under which the original sentencing recommendation had been made were subsequently amended:

> We begin our analysis with the elementary proposition that a court, within wide limits, should interpret a plea agreement according to principles of contract law. . . . Once a defendant knowingly and voluntarily enters into a plea agreement, both the defendant and the government become bound by its terms.

Id. at 286 (citations omitted).  It is important to note, however, that the First Circuit expressed no view in Rivera-Martínez as to the sentencing judge's role in accepting such an agreement in the first place.  Its elementary proposition in Rivera-Martínez, therefore, has no application to the situation which is before this Court here.[17]

---

[17] It is notable, moreover, that, after the Supreme Court vacated and remanded the First Circuit's opinion for reconsideration in Rivera-Martinez v. United States, 131 S. Ct. 3088 (2011) (mem.), in light of Freeman v. United States, 131 S. Ct. 2685 (2011), the First Circuit altered its language in the opinion it reinstated, United States v. Rivera-Martínez, 665

## 2. Plea Bargains Are Triadic Asymmetrical
## Structures Rather than Dyadic Contracts

In the Court's view, the dyadic contractual analogy, which presents plea bargains merely as compacts between prosecutor and defendant, is unfortunate.  This is because it invites confusion as to the nature of the particular triadic relationship within which the relevant parties -- namely, the executive branch, the criminal, and the judge -- stand.

The confused metaphor of plea-bargain-as-contract arises from a fundamental misunderstanding that obscures two different kinds of interpretation.  There is a tendency to conflate the question as to how we ought properly interpret the terms of particular agreements (a question of construction, or rather a question of the appropriate interpretive methodology we ought adopt <u>for</u> construction) with the one as to how we ought interpret the nature of the agreement itself in the eyes of the law (a mixed ontological and legal-doctrinal question which both takes account of the role of the court vis-à-vis the parties and the values which are at stake in dispensing criminal justice).  There is binding authority as to the former question, which this Court accepts without question.  <u>See</u> <u>United States</u> v.

_____

F.3d 344 (1st Cir. 2011), <u>cert. denied</u>, 133 S. Ct. 212 (2012) (mem.), so that it made no reference to the contract analogy.

Baldacchino, 762 F.2d 170, 179 (1st Cir. 1985) ("Though a matter of criminal jurisprudence, plea bargains are subject to contract law principles insofar as their application will insure the defendant what is reasonably due him."). The latter question, however, remains open for this Court's analysis. Cf. supra note 17 (noting the First Circuit's treatment of this metaphor in United States v. Rivera-Martínez, 665 F.3d 344 (1st Cir. 2011), cert. denied, 133 S. Ct. 212 (2012) (mem.)). It is to this latter question that this Court now turns.

Much apparent confusion may be avoided by parsing between the relevant interests that the district judge is bound to consider in placing the imprimatur of the judicial branch on the executive's invocation of the coercive power of the state. Clarity may be restored by addressing the analogy's logical structure.

Cass Sunstein describes the prepositional structure of analogical reasoning as follows: "(1) A has characteristic X; (2) B shares that characteristic; (3) A also has characteristic Y; (4) Because A and B share characteristic X, we conclude what is not yet known, that B shares characteristic Y as well." Cass R. Sunstein, Commentary, On Analogical Reasoning, 106 Harv. L. Rev. 741, 743 (1993).

Both plea bargains and private contractual agreements
involve negotiations between two parties which are, at least in
the first instance, set apart from the court's oversight; they
share this characteristic (the "X" in Sunstein's prepositional
structure).  But there are important characteristics, amid their
heterogeneous layers of complexity, which are not shared between
the two, which gives rise to the danger of drawing false
inferences.

Because no two things between which we analogize are
exactly the same, any would-be analogy begs the following
question -- to wit, which features of the two items that form
the subject of our comparison are relevant for our purposes?
Analogical reasoning, as Sunstein astutely notes, provides no
guarantee of the truth because it rests on an assumption about
relevancy which can be flawed: "For analogical reasoning to work
well, we have to say that the relevant, known similarities give
us good reason to believe that there are further
similarities . . . .  Of course this is not always so."  Id. at
744.  And, indeed, it is not so here.

The analogy of plea-bargain-as-contract is more apt to
obscure than reveal the appropriate role of the court vis-à-vis
the bargaining parties.  It does not commend itself to this
Court, in this case, for three principal reasons.

First, it does not sufficiently capture the court's role in vetting plea bargains -- the court is charged not only with carefully scrutinizing a defendant's guilty plea, but also with making or (as in the case of a (C) plea) reviewing the parties' own recommendations for sentencing, which considerations are not at play in the court's supervision of private contracts. Second, it disregards the heightened considerations of public interest which obtain in the criminal, rather than the private law, context.  Third, unlike the court's minimal scrutiny as to the procedural conditions under which private contracts are formed (and its supervision along the fringes of private law for contracts which may be void as against public policy), in accepting a plea bargain and moving thereafter to sentence the defendant, the court places the imprimatur of legitimacy, as an independent branch of government, on the parties' bargain.

In other words, as Máximo Langer notes, the problem with plea bargain as contract is that it figures the dispute as one taking place "between two parties (prosecution and defense) before a passive decision-maker."  Máximo Langer, From Legal Transplants to Legal Translations: The Globalization of Plea Bargaining and the Americanization Thesis in Criminal Procedure, 45 Harv. Int'l L.J. 1, 4 (2004).

### 3. Reconstructing the Triadic Relationship

The most forceful, compelling, and persuasive advocate for the restoration of the appropriate triadic relationship in these circumstances is Judge Jed Rakoff.  Although writing in a context different from the criminal matters which presently concern this Court, Judge Rakoff noted that there is something markedly unusual about private settlements which appear to carry the imprimatur of the court.  See SEC v. Citigroup Global Mkts., Inc., 827 F. Supp. 2d 328, 332 (S.D.N.Y. 2011) (Rakoff, J.).[18]  In his order denying approval of a proposed consent judgment proffered by the Securities and Exchange Commission (the "SEC") and Citigroup Global Markets, Inc. ("Citigroup"), a major financial institution, which involved a request for injunctive relief although Citigroup denied any wrongdoing, Judge Rakoff described the difference between private settlement and the public endorsement of the court:

> Purely private parties can settle a case without ever
> agreeing on the facts, for all that is required is
> that a plaintiff dismiss his complaint.  But when a
> public agency asks a court to become its partner in
> enforcement [without knowledge of the facts] . . .,

---

[18] I cannot overstate my intellectual debt to Judge Rakoff. District court opinions bind only the parties before the Court. They have no precedential value.  Indeed, I have heard the Federal Supplement called "the vanity press" of district judges. Yet every so often an opinion comes along that rings so absolutely true that it immediately compels a reassessment of past practices.  This is such an opinion.

the court becomes a mere handmaiden to a settlement
privately negotiated on the basis of unknown facts,
while the public is deprived of ever knowing the truth
in a matter of obvious public importance.

Id. (footnotes omitted); see also SEC v. Bank of Am. Corp., 653

F. Supp. 2d 507, 512 (S.D.N.Y. 2009) (Rakoff, J.) ("The proposed

Consent Judgment in this case suggests a rather cynical

relationship between the parties: the S.E.C. gets to claim that

it is exposing wrongdoing on the part of the Bank of America in

a high-profile merger; the Bank's management gets to claim that

they have been coerced into an onerous settlement by overzealous

regulators."); Jed S. Rakoff, Are Settlements Sacrosanct?,

Litig., Summer 2011, at 15, 17 (expressing concern at the

"failure of the adversary system to operate in the context of"

settlements in which both parties -- prosecutor and defendant --

agree).[19]

    Remarking that "[i]t is not . . . the proper function of

federal courts to dictate policy to executive administrative

agencies," SEC v. Citigroup Global Mkts. Inc., 673 F.3d 158, 163

(2d Cir. 2012) (per curiam), the Second Circuit saw fit to grant

the SEC's motion to stay Judge Rakoff's order because, it held,

the parties had a sufficiently strong chance of overturning the

---

    [19] This Court explored these same limitations of the
adversary system in In re Relafen Antitrust Litig., 231 F.R.D.
52 (D. Mass. 2005).

district court's ruling, see id. at 163-66.  This Court

nevertheless is moved by Judge Rakoff's reasoning,[20] which

---

[20] Judge Rakoff is not alone in voicing concerns about the short shrift given to the public interest were the federal district courts not to review consent agreements carefully. Throughout the republic, federal district judges are expressing disquiet at the subordination of the public interest to the several interests of the parties.  See, e.g., SEC v. CR Intrinsic Investors, LLC, No. 12 Civ. 8466(VM), 2013 WL 1614999, at *4 (S.D.N.Y. Apr. 16, 2013) (Marrero, J.) (disputing that "Congress intended the judiciary's function in passing upon these settlement agreements as illusory, as a predetermined rubber stamp for any settlement put before it by an administrative agency, or even a prosecutor" (emphasis added)); Fairness Hr'g Tr. at 6:1-5, In Re: Citigroup Inc. Sec. Litig., No. 07-cv-09901-SHS (S.D.N.Y. Apr. 8, 2013) (Stein, J.) (expressing doubt that "there is any true deterrent effect of a settlement such as this if all that is happening is the current shareholders are paying prior shareholders and themselves, and the decision-makers are not having to dip into their pocket"); Settlement Conference Tr. at 12:12, 12:14, CR Intrinsic Investors (S.D.N.Y. Mar. 28, 2013) (Marrero, J.) (noting that, in the context of courts' growing scrutiny of no-admission consent agreements, "[t]he ground is shaking . . . [t]here are some tremors"); Order Denying Entry Final Js. at 1, SEC v. Bridge Premium Fin., No. 12-cv-02131-JLK-BNB (D. Colo. Jan. 17, 2013) (Kane, J.), ECF No. 53 (noting the disapproval of a settlement under which the defendants purported to "waive their rights to the entry of findings of fact and conclusions of law pursuant to FRCP 52 and their rights to appeal," as "[t]hese findings are important to inform the public and the appellate courts" (citing Philip Hamburger, Unconstitutional Conditions: The Irrelevance of Consent, 98 Va. L. Rev. 479 (2012)); SEC v. Cioffi, 868 F. Supp. 2d 65, 74 (E.D.N.Y. 2012) (Block, J.) ("A district court is surely not required to rubber stamp every settlement between the SEC and a defendant."); Tr. Status Conference Hon. Richard J. Leon U.S. Dist. Judge at 9:2, 9:10-14, SEC v. Int'l Bus. Machs. Corp., No. 11-cv-00563-RJL (D.D.C. Dec. 20, 2012) (Leon, J.), ECF No. 10 ("This is not a rubber stamp court. . . . This Court has had a lot of SEC enforcement cases, and I don't just sign it and turn it over.  I am part of a growing number of District judges in the country who have

necessarily applies a fortiori here in the criminal context. Here, of course, this Court makes no attempt to question the policy choices of executive administrative agencies; it merely seeks to ensure that the sentence imposed upon Orthofix fosters (1) the protection of the public, (2) specific and general deterrence, and (3) respect for the law.

To be sure, this Court is not presented with the same concerns here as those which arrested Judge Rakoff. In part this is because, unlike the defendant in his case, both Orthofix and APTx were prepared to make (and, in the case of Orthofix, has now made) a public admission of guilt. But this Court is, nonetheless, moved by Judge Rakoff's concern that "a court,

_____

grown increasingly concerned about that kind of conduct . . . ."); FTC v. Circa Direct LLC, No. 11-2172 RMB/AMD, 2012 WL 589560 (D.N.J. Feb. 22, 2012) (Bumb, J.) ("Recently, the propriety of courts approving settlements of regulatory actions, similar to the Order at issue here, has been questioned."); Letter at 1, SEC v. Koss Corp., No. 11-cv-00991-RTR (E.D. Wis. Dec. 20, 2011) (Randa, J.), ECF No. 5 ("The Court requests that the SEC provide a written factual predicate for why it believes the Court should find that the proposed final judgments are fair, reasonable, adequate, and in the public interest." (citing Citigroup Global Mkts., 827 F. Supp. 2d 328)); Tr. Status Hr'g Hon. Ellen Segal Huvelle U.S. Dist. Judge at 57:8-10, SEC v. Citigroup, Inc., No. 10-cv-01277-ESH (D.D.C. Aug. 16, 2010) (Huvelle, J.), ECF No. 13 ("You expect courts to rubber-stamp, but you can't. . . . I'm very sympathetic to Judge Rakoff."). See generally Patricia Jo, The "Rakoff Effect": The Growing Trend of Heightened Judicial Scrutiny of Government Settlements with Corporate Defendants (Spring 2013) (on file with the Social Law Library), available at http://www.socialaw.com/slbook/judgeyoung13/Patricia%20Jo-%20Spring%202013%20Paper.pdf.

while giving substantial deference to the views of an administrative body vested with authority over a particular area, must still exercise a modicum of independent judgment." Citigroup Global Mkts., 827 F. Supp. 2d at 331.  In other words, when a court is asked to place its imprimatur on the parties' invocation of the coercive power of the state, it must consider whether the recommended sentence will best serve the public interest.  It would be wrong to infer from the parties' confidence that their narrow interests are served by the bargain that the bargain thereby addresses the broad range of concerns which are held by the public.  Id. at 335 ("[T]he parties' successful resolution of their competing interests cannot be automatically equated with the public interest . . . .").

Although a judge's decision to accept a guilty plea with an attendant sentencing recommendation is different from a judge's decision to issue a consent order, similar considerations of public interest obtain.  Richard Bierschbach and Stephanos Bibas make this point most eloquently when they argue that it is precisely because the parties are inclined to regard themselves as dealmakers, each zealously securing their own several interests, that the court has to guard vigilantly the interests of the public:

> There is only one thing missing from this rosy mutuality of advantage: justice. Sentencing should not be about haggling over the market price of a sack of potatoes, but about doing justice. In a democracy, justice must heed public values and voices . . . . The interests and views at stake are not limited to those of two partisans who bring their deal to the sentencing judge as a fait accompli. Those partisans may selectively present information and pursue private agendas that may diverge from those of the public at large. As prosecutors are imperfect agents of the public interest, we cannot complacently trust plea bargaining to do justice.[21]

Richard A. Bierschbach & Stephanos Bibas, Notice-and-Comment Sentencing, 97 Minn. L. Rev. 1, 3-4 (2012). It is for this reason that we ought strive to resist William Stuntz's gloomy analysis that the role of the criminal law today is primarily "not to define obligations, but to create a menu of options for prosecutors." William J. Stuntz, Plea Bargaining and Criminal Law's Disappearing Shadow, 117 Harv. L. Rev. 2548, 2548 (2004). Because, as Bierschbach and Bibas argue, the parties cannot be expected to dispense justice by themselves, it is incumbent upon the judge to ensure that justice is done when performing her function in vetting plea bargains and imposing sentences.

---

[21] For more on the pressures and incentives motivating prosecutors and defense attorneys, see Stephanos Bibas, Plea Bargaining Outside the Shadow of Trial, 117 Harv. L. Rev. 2463 (2004).

### C. Corporate Criminals Raise Heightened Considerations of Public Interest

#### 1. The Court Must Consider the Particular Characteristics of the Defendant in Discharging Its Sentencing Function[22]

In exercising her discretion, the judge has available to her a variety of ancillary tools. One of these tools is the Guidelines, which help provide the district court with, what the First Circuit has acknowledged to be, a hortatory "roadmap when sentencing." United States v. Madera-Ortiz, 637 F.3d 26, 29 (1st Cir. 2011) (quoting United States v. Dávila-González, 595 F.3d 42, 46 (1st Cir. 2010)), cert. denied, 131 S. Ct. 2982 (2011) (mem.). Another tool is the statutory factors enumerated in 18 U.S.C. section 3553(a) ("Section 3553(a)"). After suggesting that a federal district judge ought first establish a guideline sentencing range, and consider the appropriateness of

---

[22] On the need for individualized sentencing in white collar criminal cases (like these), see Todd Haugh, Sentencing the Why of White Collar Crime, 82 Fordham L. Rev. (forthcoming) (manuscript at 68-69), available at http://ssrn.com/abstract= 2244569 ("Although judicial inquiry into offender neutralizations raises legitimate concerns regarding increased sentencing disparity and institutional competence, on the whole neutralization inquiries are beneficial. When undertaken in a transparent manner by judges educated about the role of neutralizations in white collar cases, these inquiries can increase individualized sentencing and potentially disrupt the mechanisms that cause some white collar crimes. Because neutralization inquiries are legally and normatively justified, they should become a larger part of the white collar sentencing discussion.")

any possible departure from that range, Madera-Ortiz, 637 F.3d at 29-30, the First Circuit has held that the sentencing court "should then weigh the sentencing factors adumbrated in 18 U.S.C. § 3553(a)," id. at 30.

Section 3553(a) provides a range of factors to guide the district court in determining the appropriate sentence to be imposed. Although the judge need not follow the Guidelines slavishly, id. (noting that all such recommendations are designed to "ensure that the sentence imposed will be the product of the district court's individualized and fact-intensive decisionmaking" (emphasis added)), she must at least consider them before she imposes her sentence, see Gall, 552 U.S. at 51 (noting that an appellate court must "ensure that the district court committed no significant procedural error, such as . . . failing to consider the § 3553(a) factors").

Section 3553(a) recommends, in relevant part, that the judge ought have regard to the following factors:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed --
  (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
  (B) to afford adequate deterrence to criminal conduct;
  (C) to protect the public from further crimes of the defendant; and

> (D) to provide the defendant with needed
> educational or vocational training, medical
> care, or other correctional treatment in the
> most effective manner;
> (3) the kinds of sentences available.

18 U.S.C. § 3553(a)(1)-(3) (emphases added).  Several of these criteria, emphasized above, will become relevant in the discussion that follows regarding the peculiar characteristics of the corporate criminal and the especial considerations of public safety and general deterrence that arise in the sentencing of such corporate criminals.

The factors enumerated in Section 3553(a) help this Court in structuring its investigation of the particular kinds of public interest considerations posed by defendants.  Section 3553(a)(1), for example, recommends that the judge take account of the "characteristics of the defendant."  Id. § 3553(a)(1) (emphasis added).  It is to the special characteristics of organizational defendants, and the particular considerations that they raise at the sentencing stage, that this Court now turns.[23]

---

[23] For a groundbreaking article on the particular public interest concerns presented by corporate actors as juridical persons, see Paul Vinogradoff, Juridical Persons, 24 Colum. L. Rev. 594 (1924) (noting that, in the case of a corporation, "[t]he interests of third parties and of the public in general have to be safeguarded by the State," id. at 595).

## 2. The Nature and Character of Corporations

"Until roughly twenty years ago, organizations were
sentenced under the same standards as individuals." Timothy A.
Johnson, Note, Sentencing Organizations After Booker, 116 Yale
L.J. 632, 639 (2006). Corporations are sentenced presently,
however, under separate standards pertaining to organizations
articulated in Chapter 8 of the Guidelines. See U.S. Sentencing
Comm'n, Guidelines Manual ch. 8 (2012) [hereinafter Guidelines
Manual], available at
www.ussc.gov/Guidelines/2012_Guidelines/Manual_PDF/2012_Guidelin
es_Manual_Full.pdf. While there are various ways in which
corporations as juridical persons can be exposed to the same
types of criminal liability as natural persons, see e.g., Liquid
Air Corp. v. Rogers, 834 F.2d 1297, 1306 (7th Cir. 1987) ("A
corporation may be a 'person' under RICO."); United States v.
Cincotta, 689 F.2d 238, 241 (1st Cir. 1982) ("A corporation may
be convicted for the criminal acts of its agents, under a theory
of respondeat superior."); Boise Dodge, Inc. v. United States,
406 F.2d 771, 772 (9th Cir. 1969) (per curiam) ("[A]
corporation, through the conduct of its agents and employees,
may be convicted of a crime, including a crime involving
knowledge and willfulness."), the corporation exhibits, both
legally and metaphysically, a number of important differences,

when compared with a natural person, which are relevant to the judge at the sentencing stage, see, e.g., A.V. Dicey, The Combination Laws as Illustrating the Relation Between Law and Opinion in England During the Nineteenth Century, 17 Harv. L. Rev. 511, 513 (1904) (stating, on the metaphysical character of corporations, that "[w]hen a body of . . . men bind themselves together to act in a particular way for some common purpose, they create a body which, by no fiction of law but from the very nature of things, differs from the individuals of whom it is constituted"); Paul Vinogradoff, Juridical Persons, 24 Colum. L. Rev. 594, 596 (1924) (stating, on the legal privileges afforded corporations, that "the formation and conduct of a company . . . involves, besides protection, privileges in the public law" and that "[s]uch privileges are expressed in the fact of the creation of a permanent group-personality and are confirmed, as a rule, by the granting of incorporation").

Organizational criminals pose greater concerns than natural persons for two important reasons.

First, organizational criminals suffer from the fiction of representation in a way that natural persons do not.  The natural person enjoys a large degree of correspondence between her metaphysical characteristics and her legal personality; natural persons who represent the corporation, by contrast, are

not coextensive with its juridical person.  As Philip Pettit

notes, corporations have character, though the corporate

character might be easily elided with the several characters of

the natural persons who speak on its behalf:

> [E]ntities operate via their members, although they
> retain their corporate identity through continuous
> changes of membership.  Specifically, they operate
> through their members in such a way that they simulate
> the performance of individual agents.  They endorse
> certain goals and methods of reviewing goals and
> certain judgments and methods of updating judgments,
> and they follow procedures that enable them to pursue
> those goals in a manner that makes sense according to
> those judgments.

Philip Pettit, Responsibility Incorporated, 117 Ethics 171, 172

(2007).  The phenomenon Pettit describes gives rise to various

challenges.  In the sentencing context, for example, it can be

more difficult to assess the corporation's sincerity and its

capacity for rehabilitation, given the difficulty in tracing its

attitudes and expectations towards the relevant legal norms

going forward.[24]

---

[24] Even though, as Thomas Scanlon notes, we might regard an
agent such as a corporation as responsive to reason, see T.M.
Scanlon, Moral Dimensions: Permissibility, Meaning, Blame 162
(2010) ("[Although] [i]t makes no sense to attribute feelings or
emotions to . . . collective agents, . . . it makes more sense
to see such entities, under appropriate conditions, as being
responsive to reasons.  This makes sense if two conditions are
fulfilled.  First, the entity must be a collective agent . . . .
[Second,] the entity must be organized in a way that we can see
it as receiving information of the relevant kind, and processing
it in a way that regularly affects its decisions."), it can be

Second, organizational defendants possess, by their potential strength in numbers, the potential to wreak far more damage to the public interest than do natural persons acting without coordination.  See, e.g., Christopher A. Wray & Robert K. Hur, The Power of the Corporate Charging Decision over Corporate Conduct, 116 Yale L.J. Pocket Part 306 (2007), available at http://yalelawjournal.org/images/pdfs/529.pdf (noting that "organizational sentencing decisions . . . have such weighty consequences -- not only for the corporate defendant, its employees and shareholders, but potentially for an entire industry sector"); Memorandum from Paul J. McNulty, Deputy Att'y Gen., to Heads of Dep't Components & U.S. Att'ys 2 (Dec. 12, 2006), available at http://www.justice.gov/dag/ speeches/2006/mcnulty_memo.pdf (noting that "certain crimes that carry with them a substantial risk of great public harm, e.g., environmental crimes or financial frauds, are by their nature most likely to be committed by businesses").

---

difficult to identify the corporation's prospective attitudes towards legal norms qua corporation, rather than merely those attitudes held by certain of the corporation's legal representatives.

### D. Corporate Criminals, as Prospective Candidates for Sentencing, Are Not Well Suited to the Unusual Procedural Constraints Imposed by (C) Pleas

#### 1. To Accept a (C) Plea from a Corporate Criminal Is to Leave the Court Fettered in the Discharge of Its Sentencing Function and Hamstrung in Its Protection of the Public Interest

Rule 11(c)(1)(C) states, in relevant part, as follows:

(c) Plea Agreement Procedure.
(1) In General. An attorney for the government and the defendant's attorney, or the defendant when proceeding pro se, may discuss and reach a plea agreement. The court must not participate in these discussions. If the defendant pleads guilty or nolo contendere to either a charged offense or a lesser or related offense, the plea agreement may specify that an attorney for the government will . . .

> (C) agree that a specific sentence or sentencing range is the appropriate disposition of the case, or that a particular provision of the Sentencing Guidelines, or policy statement, or sentencing factor does or does not apply (such a recommendation or request binds the court once the court accepts the plea agreement).

Fed. R. Crim. P. 11(c)(1)(C) (emphasis added). The (C) plea applies in an all-or-nothing fashion. Once the judge accepts a (C) plea, she is compelled to impose the attendant sentence recommendation without tinkering with the details. Id.; Freeman v. United States, 131 S. Ct. 2685, 2692 (2011) ("Rule

36

11(c)(1)(C) makes the parties' recommended sentence binding on the court 'once the court accepts the plea agreement' . . . ."); see also United States v. Rodríguez-González, 433 F.3d 165, 169 (1st Cir. 2005) ("[United States v. Teeter, 257 F.3d 14 (1st Cir. 2001),] makes clear that a trial judge, although not required to follow a stipulation (outside Fed. R. Crim. P. 11(c)(1)(C)), may normally rely on the defendant's stipulation in determining what is the correct sentence." (emphasis added)). As regards the judge's role in sentencing, her hands are tied once she accepts a (C) plea so that she cannot tailor a sentence which fits the defendant's circumstances exactly. The judge ought therefore consider the (C) plea with no small amount of circumspection, lest her role in dispensing criminal justice amount to no more than that of sentencing-by-number, imposing conditions -- as she might apply paint -- mechanically from a scheme of the parties' choosing.

"[A] defendant has no right to be offered a plea, nor a federal right that the judge accept it." Missouri v. Frye, 132 S. Ct. 1399, 1410 (2012) (citations omitted) (citing Weatherford v. Bursey, 429 U.S. 545, 561 (1977); Santobello, 404 U.S. at 262). To the contrary, the judge is duty-bound to consider whether the recommended sentence would serve the public interest before deciding whether to accept the plea. See Freeman, 131 S.

Ct. at 2692 ("Rule 11(c)(1)(C) permits the defendant and the prosecutor to agree that a specific sentence is appropriate, but that agreement does not discharge the district court's independent obligation to exercise its discretion.").

Given the complex nature of corporate criminals, and the gravity of the potential danger they pose to the public, see supra section II.C.2, it does not seem provident for the Court to accept a guilty plea under a procedural mechanism which hamstrings it in the performance of its sentencing function. The (C) plea, from this Court's perspective, is a decidedly blunt tool for the court's administration of criminal justice.

A (B) plea, however, does not present the same concerns. With the (B) plea, in contrast, the judge may accept the guilty plea without necessarily imposing the recommendation proffered by the parties. United States v. Yeje-Cabrera, 430 F.3d 1, 28 (1st Cir. 2005) ("Rule 11(c)(1)(B) expressly contemplates that the attorney for the government can agree with the defendant's request that a sentencing factor does or does not apply, though this is not binding on the court." (emphasis added)); United States v. Rodriguez, 376 F. Supp. 2d 1, 2 n.6 (D. Me. 2005) (Hornby, J.) ("The plea agreement is a Rule 11(c)(1)(B) agreement, not binding on the Court.").  The judge is at liberty to tinker with or overhaul completely the parties'

recommendations, so long as she considers the appropriate Guidelines.  See Orthofix's Sentencing 5:13-16 ("[I]t's not going to be a [(C)] plea, it's going to be a [(B)] plea, which leaves to me the responsibility, the authority, but the corresponding responsibility, to frame the sanction . . . .").

### 2. The Sentencing Recommendation Appended to Orthofix's Rejected (C) Plea Did Not Sufficiently Protect the Public Interest

As this Court has already expressed during a previous sentencing hearing, it is "not . . . opposed institutionally in a general way to plea bargaining."  Orthofix's Sentencing 25:3-4.  When confronted with the heightened considerations of public interest that are engaged in the sentencing of corporate criminals, however, the Court's review of any proffered sentencing recommendation will be most exacting.  In conducting this review, the Court must ensure that, before it approves any plea, the sentencing recommendations sufficiently protect the public interest.

After evaluating both the original and revised sentencing recommendations attached to Orthofix's pleas in light of these heightened considerations, this Court determined that the sentencing recommendations submitted, though sensitive and meticulous, fell short in two important respects.

39

First, the recommendation failed to request that this Court impose a five-year period of probation on Orthofix, nor did it recommend that the Court incorporate the terms of the Corporate Integrity Agreement as a term of probation.  See Orthofix's Original Plea ¶ 5(d) ("The United States Agrees that it will not seek a term of probation in light of the Corporate Integrity Agreement . . . ."); Orthofix's Revised Plea ¶ 5(d) (same). Second, it failed to include a non-disparagement provision.  See Orthofix's Original Plea ¶ 5; Orthofix's Revised Plea ¶ 5.

### a. The Importance of Probation

Under 18 U.S.C. section 3561(a), an organization may be sentenced to a term of probation.  See 18 U.S.C. § 3561(a).  In determining whether the imposition of a term of probation is appropriate in a particular case involving an organizational offender, the judge is invited to consider Guidelines regarding the sentencing of organizations.  Chapter 8 of the Guidelines enumerates criteria to assist the federal bench in its sentencing of organizations.  See Guidelines Manual ch. 8. Section 8D1.1(a) of the Guidelines provides, in particular, that a court "shall[25] order a term of probation" where, inter alia,

---

[25] As this Court has noted above, in light of the Supreme Court's decision in Booker, 543 U.S. 220, it is now appropriate

"such sentence is necessary to ensure that changes are made within the organization to reduce the likelihood of future criminal conduct," id. § 8D1.1(a)(6), at 525, or where "necessary to accomplish one or more of the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2)," id. § 8D1.1(a)(8), at 525.

Because the Court in United States v. Orthofix, Inc., No. 12-10169-WGY, along with countless other federal courts involved in sentencing similar organizational offenders,[26] has found that the imposition of a period of probation furthers these sentencing objectives,[27] it imposed a five-year period of

---

to read such language in the Guidelines as hortatory rather than mandatory.  See also Madera-Ortiz, 637 F.3d at 29.

[26] For the fiscal year 2012, federal courts imposed probation requirements on 72.2% of organizational offenders. 2012 Sentencing Statistics, supra note 13, tbl.53, available at http://www.ussc.gov/Research_and_Statistics/Annual_Reports_and_S ourcebooks/2012/Table53.pdf.

[27] Although Christopher Wray generally prefers the use of fines to the imposition of probation in the sentencing of corporate criminals, see Christopher A. Wray, Note, Corporate Probation Under the New Organizational Sentencing Guidelines, 101 Yale L.J. 2017, 2030-31 (1992), this Court is confident that imposing a period of probation in order to ensure an organization's compliance with a forward-looking ethics plan is a proper tool for the realization of the Guideline's sentencing objectives to which Wray refers, id. at 2030 ("[T]he SRA requires corporate probation to further six objectives: (1) 'just punishment'; (2) deterrence; (3) incapacitation; (4) rehabilitation; (5) determinacy; and (6) restitution to

probation which incorporated the terms of the Corporate Integrity Agreement in its sentencing of Orthofix on December 14, 2012.  Orthofix's Sentencing 23:21-25.  That the Court would have rendered itself impotent to impose this important sentencing condition, had it accepted Orthofix's (C) plea, would have been reason enough to reject it.  The parties' recommendations, however, gave the Court further cause for concern.

### b. The Importance of Non-Disparagement

In addition to failing to recommend probation, the parties failed to include, as a special condition of probation, a provision which would prohibit Orthofix (and its affiliates) from disparaging the factual basis of the guilty plea or abnegating their admission of guilt.  See Orthofix's Original Plea ¶ 5; Orthofix's Revised Plea ¶ 5.  In the Court's view, a clause preventing organizations from disparaging the factual basis of their plea, or their admission of guilt after the fact, is crucial to the protection of the public interest and the preservation of the normative character of the criminal law.[28]

---

victims." (footnotes omitted) (citing 18 U.S.C. § 3553(a)(2), (6), (7) (1988))).

[28] The Court is not alone in holding this view.  Earlier this year, Judge Terrence W. Boyle expressed a similar concern

There is an appreciable risk that (C) pleas, like consent judgments, will (in the words of Judge Rakoff) be "viewed, particularly in the business community, as a cost of doing business imposed by having to maintain a working relationship with a regulatory agency." Citigroup Global Mkts., 827 F. Supp. 2d at 333. This Court is sensible of the danger that the Federal Rules of Criminal Procedure might similarly be exploited by the hardnosed commercial strategist. Such a person (whether natural or juridical), informed by a bad-man's view of the law,[29] poses a threat to the normative character of our criminal justice system. It is the Court's view that a corporation ought not be able to make a decision to break the law based on a

---

in his order in United States v. WakeMed, No. 5:12-CR-398-BO, 2013 WL 501784 (E.D.N.C. Feb. 8, 2013) (Boyle, J.). There, in granting the parties' request to defer prosecution (pursuant to a joint prosecution agreement) after WakeMed, a private not-for-profit healthcare organization, was charged with making materially false statements to a federal healthcare benefit program contrary to 18 U.S.C. sections 2 and 1035, he cited, with approbation, the parties' agreement "not to make public statements contradicting the agreed upon statement of facts." Id. at *1.

[29] The Court has in mind then-Justice of the Supreme Judicial Court Oliver Wendell Holmes's description of the bad man in his 1897 speech given at Boston University School of Law. See Oliver Wendell Holmes, Jr., The Path of the Law, 10 Harv. L. Rev 457, 459 (1897) ("If you want to know the law and nothing else, you must look at it as a bad man, who cares only for the material consequences which such knowledge enables him to predict, not as a good one, who finds his reasons for conduct, whether inside the law or outside of it, in the vaguer sanctions of conscience.").

prudential calculation that (1) it will be able to cap its future risk by negotiating a (C) plea with our government and (2) it will mitigate the consequent damage to its corporate reputation by later disparaging its guilty plea.  The sentencing judge must exercise vigilance, in the face of a threat from these hypothetical bad actors, against those who view the law merely in terms of a speculative economic calculation, refusing to acknowledge the normative force of the criminal law.  Were a court to accept a (C) plea without inserting a provision securing the plea's non-disparagement, it could risk reducing the effectiveness of general and specific deterrence.  It is for these reasons, therefore, that this Court imposed a non-disparagement clause in its sentencing of Orthofix.  Orthofix's Sentencing 23:25-24:5.

### 3. The Sentencing Recommendation Appended to APTx's Tendered (C) Plea Did Not Sufficiently Protect the Public Interest

In anticipation of APTx's sentencing hearing on April 11, 2013, the government contended that the Court ought accept APTx's (C) plea because it is "squarely in the public interest." Gov't's Mem. Supp. APTx 1.  This Court was compelled to disagree for three principal reasons: first, the fine proposed is well below both the recommendation that follows from the Guidelines

and the congressionally mandated maximum penalty; second, in
light of this low figure, the proposed sentence would risk
undermining general deterrence; and third, for the Court to
place its imprimatur on such a bargain, however agreeable to the
executive -- once aggregated together with similar decisions
across the criminal justice system -- results in the denigration
of the criminal law.  This Court will not be complicit in
substituting the criminal law, a system predicated on justice
and robust sobriety, for a series of utilitarian compacts
punctuated by blustering admonishments.

### a. Paltry Sanctions

     At the outset, the government's recommendation as to the
appropriate fine is strikingly low.  Suppose, arguendo, that the
losses resulting from APTx's alleged commission of wire fraud
conspiracy contrary to 18 U.S.C. section 1349 were limited to
the sums paid to APTx in the December 2004 letter of credit (a
sum of greater than $5.7 million, Gov't's Mem. Supp. APTx 2);
the highest penalty to which APTx could then be subject,
consistent with the statutory limits, is twice the pecuniary
loss.  See 18 U.S.C. § 3571(d) ("If any person derives pecuniary
gain from the offense, or if the offense results in pecuniary
loss to a person other than the defendant, the defendant may be

fined not more than the greater of twice the gross gain or twice

the gross loss, unless imposition of a fine under this

subsection would unduly complicate or prolong the sentencing

process."). Based on a pecuniary loss to the United States of

$5.7 million, APTx could be fined $11.4 million. See id. The

Government's submission that a fine of $1 million is

appropriate, APTx's Plea ¶ 5(a), even taking account of the

additional civil settlement of $2 million, APTx's Civil

Settlement Agreement ¶ 1, therefore seems comparatively meager.[30]

### b. Blustering Deterrence

When asked why the government sought to bring criminal

charges while at the same time seeking such a low sanction, see

APTx's Plea Hr'g 23:7-9, 23:11-24:17, counsel argued that criminal

proceedings were necessary to ensure deterrence in a war zone,

id. at 25:5-10 ("[W]e felt very strongly that a criminal conviction

meant more than just pay the government back if you get caught.

And we wanted to hold it out as something that actually even a

foreign company could face if they committed a wire fraud on the

United States. And it wasn't just a matter of pay back the money

and go home."). This Court could not agree more with the

---

[30] The Court is not insensitive to the fact that, in the circumstances limned by the government's memorandum, the recovery of any sum is problematic. Still, the invocation of potential criminal sanctions is serious business and must be treated as such.

government's position regarding deterrence.  But it boggles at bargain-basement guilty pleas which, on the one hand, purport to invoke the specter of criminal liability, while, on the other, recommend the imposition of paltry sanctions.

Now, it might be that the government feels compelled to push for criminal prosecution at the same time as seeking a low sentence because it is motivated by complex foreign policy concerns which reside principally within the field of executive competence.  Indeed, the government made oblique references to such considerations during the plea colloquy.  Id. at 20:25-21:14.  If foreign policy is in fact driving this case, however, the Court is not unsympathetic to the executive's considered judgments; to this end, it has offered to assist the government by agreeing to review government documents submitted under seal and, if appropriate, revise its decision accordingly.  Id. at 26:1-5 ("If there are reasons with respect to future contracts with other innocent companies, and I have those documented to my satisfaction, and I can do this under seal, if that's so, I might revisit this.").  But, absent such considerations, it is hard to see how "the workout figure," id. at 26:7, serves the government's interests of achieving deterrence through a criminal charge.

When asked why a public trial[31] might not achieve greater
deterrence than a plea resulting in the imposition of meager
sanctions, the government argued, in response, that a public
trial might in fact fail to achieve this end because it fears
that it might be "a trial in absentia." [32]   Id. at 26:20.  It is
difficult to see, however, how the deterrence effect achieved by
a trial in absentia could be any less formidable than that
gained by having counsel charged by APTx with a power of

---

[31] Public trials are of enormous importance to our society,
indeed to our very character as a nation.  Thomas Jefferson
said: "I consider [trial by jury] as the only anchor, ever yet
imagined by man, by which a government can be held to the
principles of its constitution."  Letter from Thomas Jefferson
to Thomas Paine (July 11, 1789), in 15 The Papers of Thomas
Jefferson 266, 269 (Julian P. Boyd ed., 1958); see also U.S.
Const. amend. VI ("In all criminal prosecutions, the accused
shall enjoy the right to a . . . public trial . . . ."); In re
Oliver, 333 U.S. 257, 270 (1948) ("Whatever other benefits the
guarantee to an accused that his trial be conducted in public
may confer upon our society, the guarantee has always been
recognized as a safeguard against any attempt to employ our
courts as instruments of persecution.  The knowledge that every
criminal trial is subject to contemporaneous review in the forum
of public opinion is an effective restraint on possible abuse of
judicial power." (footnote omitted)); Andrew Guthrie Ferguson,
Why Jury Duty Matters (2013); Andrew Guthrie Ferguson, The Jury
as Constitutional Identity, U.C. Davis L. Rev. (forthcoming),
available at http://ssrn.com/abstract=2222158; Owen M. Fiss,
Comment, Against Settlement, 93 Yale L.J. 1073 (1984).

[32] At the same time, the government anticipates this Court's
inquiry as to whether a (B) plea might better serve their
purposes by contending that the uncertainty which a (B) plea
raises would not be acceptable to APTx.  See Gov't's Mem. Supp.
APTx 3 ("Defense counsel has represented that ETP will only have
APTx enter a guilty plea if it is a (C) plea, where the result
is known in advance.").

attorney "come over here, [without] the foggiest idea why [APTx and its erstwhile directors] are doing what they're doing, or what even they did." Id. at 27:9-11.

The government also expressed concern that trial of a foreign corporation in absentia would strike the would-be foreign organizational offender as a less-than-optimal application of criminal justice. Id. at 26:17-24. This Court, however, is satisfied that any defendant, whatever their nationality or metaphysical composition, will receive adequate due process here in the federal courts of the United States, and in this session of the district court in particular. Having considered the government's concern in its presentation of a counterfactual American response to hearing that "a Russian court was trying an American company in absentia," id. at 26:21-22, it does not strike the Court as particularly apposite. This Court would hope that a Russian organizational offender tried in the United States would enjoy comparatively greater protective procedural safeguards than those an American corporation would enjoy in Russia.[33]

---

[33] Indeed, many of the Russian elite seem particularly cognizant of the comparatively greater protections afforded by stable common law legal systems, given their apparent preference for conducting high-stakes commercial litigation in London, instead of consigning themselves to the courts of their home regimes. See, e.g., Jane Croft & Neil Buckley, Oligarchs Pick London to Do Battle, Fin. Times (Feb. 17, 2012, 8:20 PM),

Quite apart from the Court's concerns about robbing corrective justice in this particular case, and its concerns with respect to general deterrence, the Court is concerned that the government's support for the imposition of meager sanctions via (C) plea mandates threatens to replace the normative edifice of the criminal law with an empty shell that admonishes only in form and obtains meager deterrence in substance.

### c. Meager Workouts

Meager workouts figured in juridical terms strip the criminal justice system of its credence and sobriety.  This Court, a trial court, is ever-cognizant that efficiency is an important component of justice.[34]  But suborning criminal justice, and the sobriety that sustains it, to the parties'

---

http://www.ft.com/intl/cms/s/0/75e4e812-5978-11e1-abf1-00144feabdc0.html#axzz2ZQg2884H ("With the rule of law still weak in many former Soviet republics, oligarchs are relying on England's relatively stable and rigorous legal system to resolve conflicts.").

[34] See Gina L. Simms & John S. Linehan, Ober Kaler, The Judge Doth Reject: How to Prepare for Increased Judicial Scrutiny of Corporate Settlement Agreements in Health Care Cases, Ober Kaler (Winter 2013), www.ober.com/publications/2188-the-judge-doth-reject-how-prepare-increased-judicial-scrutiny-corporate ("[I]f too many impediments are placed upon government agencies in their attempts to reach compromise with corporate health care defendants, then the per-case costs of reaching resolution could increase exponentially; in turn, this trend could force agencies to redirect their scarce resources or undertake more limited agendas.")

narrow interests in particular cases is too great a price to pay for the demands of efficiency or practicality.

The government purports to invoke the specter of the criminal law in all its majesty and awe, while arguing that this organizational offender ought get away with a slap on the wrist. No doubt the government, in taking this position, is motivated by sound reasons.  But the Court will not place the imprimatur of the judiciary on bargain-basement justice.  Id. at 24:3-9 ("I don't want anyone saying, now, look at this, we mark this up as a criminal conviction here.  Look at what we're doing.  This is what the Court thought was appropriate in these circumstances.  Because were that the measure it fails on all those scores.  It does not comply with the sentencing guidelines.  It is only -- it's the same thing as a workout.").

The French philosopher Henri Bergson, in his elucidation of the comic and absurd, notes that the source of absurdity is the mechanical triumph of form over substance, the substitution of the "the manner for the matter."  Henri Bergson, Laughter: An Essay on the Meaning of the Comic 53 (Cloudesley Brereton & Fred Rothwell trans., 1914).  This Court will not, by its own hand, accept pleas that mandate the imposition of paltry sentences lest they turn the normative edifice of criminal justice into a Bergsonian theater of the absurd.

51

**III. CONCLUSION**

In light of the foregoing analysis, this Court therefore rejected the (C) pleas proffered by the parties in Orthofix and APTx, both of which are insufficiently protective of the public interest.

/s/William G. Young
WILLIAM G. YOUNG
DISTRICT JUDGE